The next case is VLSI Technology v. Intel, 2023-12-626. Mr. Vakili. Good morning, your honors. May it please the court, Cameron Vakili of Irela Manila, on behalf of VLSI Technology, the appellant and owner of U.S. patent 8020014. The board's findings of obviousness for the challenged claims of the 014 patent suffer from several critical deficiencies, whose undisputed character precludes meeting explicit limitations recited in the claim. In addition, I intend to discuss how the board relied on a disjointed reading of the prior art reference, guided by impermissible hindsight, and failed to fulfill its burden to show either motivation or expectation of success. I think the clearest shortfall of the board's finding is its reliance on the so-called L2 access ratio from who for the claimed relationship between an estimated power gain and estimated power loss resulting from powering down. The key facts are undisputed. One, the board alleged L2 access to be the claimed estimated power loss resulting from powering down. Not L2 access plus some other thing, but L2 access. Two, the board alleged leak to be the claimed estimated power gain resulting from powering down. Three, L2 access is the energy per access to L2 memory. And four, leak is the energy per cycle. Now, if I could use an analogy, we can imagine that I sell hamburgers on McDonald's or Burger King, and I want to know how much revenue am I going to lose if I shut down a location, and how much cost am I going to gain? What the board is telling me is that all I need to do to figure out how much revenue I'm going to lose is estimate the price per hamburger. Well, that's clearly not enough. I need to know how many hamburgers I sell at the location. One hamburger, a thousand hamburgers a day, it's a big difference. And similarly, the board is telling me all I need to know is the cost per hour to operate the restaurant to figure out how much cost savings I'm going to have. Well, am I going to shut down for one hour, one day, five years? Very different cost savings in those different scenarios. This is an exact analogy to the claimed power gain and power loss resulting from powering down. This board, excuse me, this court actually acknowledged this reality in its prior May 26, 2021 decision in Appeal 20-1744, where it stated, and I quote in footnote one, the dynamic power cost of a cash miss varies with the number of operations required in response to the miss. The court said, more power will be consumed if data from the cash must be deleted. Less power will be used if the cash is not full. Well, L2 access doesn't tell you anything about how full or empty the cash is. It just says the energy per access. The ratio of the price of a hamburger to the cost per hour doesn't tell you how much revenue will be lost or cost gained if you shut down a restaurant. An exact analogy, the L2 access leak ratio doesn't tell you how much power is gained or power is lost resulting from powering down a portion of a cash. It doesn't and it can't. It would appear that we decided that question against you in the first appeal. Well, I don't think that issue was addressed in the first appeal. The question there was more narrow. The question was the board's finding that L2 access leak was the basis of a determination of whether to power down. We said this satisfies the Clintonization of determining whether to power down. Exactly. Determining whether to power down, but not whether that was an estimated power gain or estimated power loss resulting from powering down. That's the question currently before the court. Now, I agree, there's no dispute that this court has ruled that L2 access leak forms the basis of a determination of whether to power down. That's ironclad. But is L2 access leak a power resulting from powering down? It's part of the same claim limitation. I'm sorry? Part of the same claim limitation. Well, it's a long limitation. It has different parts and there was a narrow issue that the board had decided. They had said that the L2 access leak ratio... You say we only said it satisfied part of the claim limitation? Your Honor, I don't believe the court reached the full issue because what had happened was the board had stated that L2 access leak was not used to determine whether to power down. That was the original final written decision. This court reversed on that point. That was the only thing before the court at the time. The question now is, does L2 access read on an estimated power loss resulting from powering down and does the leak read on an estimated power gain? And the answer is no, it can't. It simply can't. And that was not before the court in the first appeal. Similarly... We did say previously that the L2 access represents the power cost of accessing the L2 cache when the L1 cache is powered down and a cache miss ensues. I mean, I recognize that that was, you know, in discussing the determining limitation, but how do you respond to that? Because that seems to be supported by substantial evidence. I mean, that seems to be correct to me and it goes a little bit to the issue we're looking at here. Well, the L2 access is certainly a factor that's related to the amount of power that might be consumed if you have a lot of what's called dirty bits. It's the energy that is required to access stable memory. So it's relevant, but there is no information about how much dirty bits there are and who. And that issue was not before the court in the first appeal. It simply wasn't. In fact, Intel argued vociferously that it wasn't before the court at the time and I don't believe the court ruled on that issue. Similarly with leak. Leak is a separate factor where we don't know the amount of time that we're shutting down for. It's just not there. It's not there in the reference. The board hasn't pointed to it. Intel hasn't pointed to it. So we believe that L2 access and leak cannot be the estimated power gain and power loss resulting from powering down. And that's an issue of first impression in this appeal. So just to understand correctly, what you're saying is when we said it satisfies the determining limitation, you're saying we only meant that it satisfies part of the determining limitation. Well, I believe what the court. Is that correct? I mean, the determining limitation is determining whether to power down at least a portion of the component in response to a relationship, etc., etc. We said it satisfies that limitation. You're arguing now it doesn't. Well, again, in my understanding, what the court was ruling on was whether L2 access leak was the basis of a determination of whether to power down. That's what the board had said it wasn't. And this court reversed and said that it was. But whether L2 access and leak are an estimated power gain, an estimated power loss wasn't before the court in the prior appeal. This court itself, I believe, noted that. I can perhaps find the citation for that on my rebuttal time. If you have any further questions, I may continue to the next point. So, in addition, claims require an estimate of each of these values to be used in its determination. And, again, no estimate of L2 access or leak is used in connection with determining whether to power down. Now, L2 access and the L2 access leak ratio certainly is, and this is what the court found last time. But the estimates that are calculated in WHO are not used in connection with that determination. We have two estimates that come up in a literature review. One is 4 nanojoules per access for L2 access. One is 0.45 nanojoules per cycle for leak. And they also calculate the ratio to get 8.9 for a typical L2 access leak ratio. Do they subsequently use 4 nanojoules or 0.45 or 8.9 in any calculation or any determination of decay intervals or whether to power? No. It's completely absent. What they do is they throw around different numbers, 5, 10, 20, 100. Numbers that they acknowledge are assumptions. In other words, made-up numbers. Whose language did they say? We assume, quote, we assume that the L2 access leak ratio is equal to 10. Of course, the claim requires a determination on whether to power down based on two separate estimated quantities. Estimated power gain, estimated power loss. What we have are assumed values for one quantity, a ratio. What you lost the first time when we said it's immaterial. It's used experimental method relies in part on assumed values. Right? Well, so again, Your Honor, I believe our understanding is that it was immaterial to the question of whether L2 access leak formed the basis of a determination of whether to power down. Not on whether it qualified as using estimated values. Again, the narrow issue before the court at the time was the board's finding that L2 access leak was not the basis of a determination of whether to power down. The court reversed. But whether it qualified as a power gain or power loss resulting from powering down and whether estimated values of it were used in connection with the determination, those questions were not before this court in the first appeal. And in any case, the who does not return to using its value of 8.9 to plug it back in or see what the optimal decay interval would be for that because it's not concerned with using estimated values. It simply is not. Additionally, the board's obviousness determination rests on findings of motivation to combine and reasonable expectation of success. They're both critically deficient. The board's finding on motivation rests on two mistaken premises. First, the board found that Takahashi teaches first evaluating a change of cash miss rate and only then powering down a cash way based on that evaluation, which they argue would render it compatible with who, which has a different way of determining whether to power down. And second, they backstop the argument by saying, well, you know, it doesn't matter what the order of operation is because Takahashi's pre-process operation will fulfill its stated purpose anyway. These are both mistaken, and I'll take them in turn. The first point, the evidence overwhelmingly contradicts the board's finding. It shows that Takahashi's system first shuts down a cash way and then measures the resulting change in cash miss rate to determine whether to power back up, not whether to power down. Intel's position, adopted by the board, is that they say, quote, it's not based, Takahashi's not based on counting actual cash misses. They say Takahashi expressly contemplates predicting a change in cash miss rate by hypothetically powering down. There's two problems with that. One, there's nothing in Takahashi about any prediction, calculation, hypothetical, anything. It doesn't exist. And number two, there's ample evidence that Takahashi does count the actual number of cash ways that result from powering down. Takahashi refers to its cash miss counter for measuring or counting and storing the number of cash miss operations. This court, in its prior decision, stated Takahashi uses the previous measurement of the cash miss rate to track whether the cash miss rate is improving or worsening, not to predict what might happen or hypothetically, but to see if it's getting better or worse. In its abstract, Takahashi says it evaluates the cash miss rate, quote, before and after switching the number of ways. It shuts down the way, then it sees if it needs to power it back up. And most explicitly, it comes right out and says in transitioning from the preprocess mode to the two-way mode, quote, the number of activated ways is changed from one way to two ways. It's clear that it's already shut down the way, does so automatically, and then it powers it back up if the cash miss rate increases. It couldn't be any clearer on this point. This directly contradicts the board's erroneous finding on this point, which is not supported by substantial evidence, and highlights the incompatibility with who, which determines when to power down, not whether to power back up. You have to determine when to power down also. You're into your bottle time. In Takahashi, you mean? Yes. Oh, I got you. OK, I'll continue. I'll rest on that point, Your Honor. Mr. Massa. May it please the Court, Dominic Massa on behalf of Intel Corporation. With me today is my colleague, David Yin, and from Intel, Ashok Pinto, and Greg Kalbaum. Your Honors, respectfully, as Judge Dyke pointed out, each of the arguments we heard today is precluded by your original consideration of this case several years ago. But moreover, the board's decision is supported by substantial evidence on each of these points. I read the Court's prior decision, as Judge Dyke did, which is that the claim limitation determining whether to power down, including the phrase that's in that limitation, resulting from powering down, this Court found was met. And the Court's decision was clear on that. But let's see what the board did and how substantial evidence supports that. As this Court noted, and as the board found, whose basic premise is to measure the static power saved by turning off portions of the cash, and then to compare it to the extra dynamic power dissipated by turning off cash lines. And that's at Appendix 888. The issue that VLSI raises is that somehow power saved by turning off is not power resulting from powering down. But those are the same things. And this Court has already found that, and the substantial evidence supports it. There's no doubt that who is trying to determine when to turn off a cash line. That's at 891. Who also discloses at 898 an adaptive decay approach that chooses decay intervals at run time to match the behavior of individual cash funds. This is the operational system that VLSI says is lacking in who. But who describes a system that works at operation. It knows both the rate of energy being dissipated as well as the amount. Who describes multiplying the rate, the L2 ratio, by the number of cash misses? That's in who, and that's substantial evidence that the board could rely on. What about the argument that our prior opinion didn't address the requirement of an estimated power gain and an estimated power loss, and that there's somehow some difference by the emphasis on an estimated value? Again, Your Honor, I believe that the original panel did address that. And as Judge Dyke again pointed out, the panel found that it was immaterial. The same issue was raised. The same issue was raised over whether there were estimates or whether there were simulations. And the panel found that it's immaterial. And this is at 355 of the opinion. It is also immaterial that whose experimental method relied in part on assumed values of the L2 leak ratio. And I think VLSI is reading a lot into the word estimate, whether who calls it an estimate in some places or a simulation in some places or assumed values. I don't think there's any specific construction here. There is none, and there's nothing to limit the term estimate in the 014 patent to exclude a simulation versus an assumption. I think those are all fairly estimates in the scope of the claim. And again, the issue here is one that VLSI has raised, you know, late in the day and I think contradicts the Court's original opinion. But it's also clear that these estimates and simulations and assumptions in who are related, and there's substantial evidence in the record to show that. So this is who at 891 in the appendix. Section three is when this 8.9 number comes up, which is calculated, which VLSI says is a calculated value. And then section four is where VLSI says this is a totally separate teaching that is a simulation value. First of all, you read a prior art reference for all it teaches, and who teaches both these calculated values and these simulated values. But apart from that, who relates those back explicitly, right? VLSI's argument in the paper is there's no discernible relationship between these two values. Who says it explicitly? It says as calculated in section three, and this is at 891, as calculated in section three, the dynamic energy required is roughly nine times. So you have this 8.9 calculation in section three. Section four, who says, refers back. As we stated in section three, it's roughly nine. Okay, so now we're at roughly nine. And then what who says at 897 is that it's describing a graph in figure eight. Again, VLSI says there's no discernible relationship there. But what who actually says is it relates it back explicitly. In this graph, and this is figure eight, we assume that the L2 access leak ratio is equal to ten, as discussed in section three. So what it's doing is it's taking this calculation of 8.9. It's saying that's roughly nine when it's doing some math. And then later on when it's doing a graph, it says we're going to assume it's ten. These are not separate teachings. These are all within the scope of it. And not to get too deep into math, if you go back to the section three calculation, where the 8.9 comes from, that's based on dividing the access to the leak, which was a range of 3.3, a range of 3 to 5, divided by .45. If you just do the math on that range, that's a range of 6.6 to 11.11. So it chose the middle of that, which was 8.9, discussed it, and it said it's roughly nine. And then it chose a value of ten, which falls right within the range. So this is really a red herring argument, these first two arguments by VLSI, who discloses the entirety of that claim limitation, including in a system which is operational and shuts down and knows exactly what's going on. It uses these estimates and simulations that are all explicitly related to each other. It's not picking and choosing from disparate teachings in who. Can I ask you about reasonable expectation of success? I understand that was not really brought up in the opening, but one of the arguments that's made is that the board didn't provide a detailed explanation of why there was reasonable expectation of success. Rather, it was conclusory. What is your response to that? Why was that okay in this case? I believe, Your Honor, it's okay in this case as it is in other cases. And I believe Your Honor sat on a panel recently, Electa v. Zapp Surgical. This was a case that was decided after briefing was closed here. But this is a case, 81 F. 4th, 1368. In Electa v. Zapp, the Court recognized that often there's intertwining between the motivation to combine analysis and the reasonable expectation of success, and that in the Electa case, I think, was the extreme. There was no discussion of expectation of success by the board. But this Court found in a precedential opinion that even that it could be implicitly found. Okay? Now, where is the implicit, most importantly, because I hear what you're saying, but that is a case-by-case determination. So here, where is it implicitly addressed? And I'd say, actually, Your Honor, I was going to say that's the extreme case. And here, it was explicitly addressed. So the board did discuss both in the context of motivation to combine and reasonable expectation of success. And it made explicit findings on those, both of those issues. And I can get you a citation to it in one second here. But while I'm looking for the citation, Your Honor, I mean, what we have here are two systems that are very, very closely related. We're in the world of computing systems with caches, with multilevel caches, with deciding when to power down a portion of the cache. And both Takahashi and Hu describe looking at various parameters available regarding the power loss and the power gain to then make that determination. And with thanks to Mr. Yin, Appendix 36, so this is in the final decision, there would have been a reasonable expectation of success in doing so as both references teach using information related to cache or misses to determine when to power down a portion of the cache, and who additionally teaches turning off cache lines based on a comparison between estimated power loss and estimated power gain. So it's an explicit finding. One of the arguments made is that there's no reasonable expectation of success for the dependent claims. Is that necessary? Why? No. That's really what I was referring to. So first of all, Your Honor, the – again, that argument applies only to the dependent claims who would have no import on independent claims 1 and 12. But besides that, VLCI made no differentiating arguments as far as motivation to combine or reasonable expectation of success with respect to the dependent claims. So they never argued before the Board or really in this briefing that there's something particular about the dependent – the additional limitations found in the dependent claims. So the Board can take the analysis that it used for the independent claims and apply that to combining Takahashi and Hu for the dependent claims. Now – So for the dependent claims, the only issue is whether that combination, that where there's a motivation to combine and there's reasonable expectation of success, actually teaches the limitations of the dependent claim? Is that what you're saying? So, Your Honor, what I'm saying here is, in particular with these dependent claims, the petition found that all those elements were in Takahashi. Okay? So you had the first couple elements in Takahashi. You had this determining limitation from Hu. And then the dependent claim elements from Takahashi. So when you're talking about the motivation to combine and you're talking about the reasonable expectation of success, you're talking about that element from the teaching of Hu, can that fit in with Takahashi? That's resolved by the Board with respect to Claims 1 and Claim 12. That's no longer an issue when you're talking about the dependent claims. What you have then is just the addition of a dependent claim element. That's just taking Takahashi qua Takahashi. And Takahashi as modified by Hu. Right. Takahashi as modified by Hu, adding just another teaching from Takahashi into that mix. So you don't need to combine Takahashi and Hu for the dependent claim elements. Thank you, Your Honors. Thank you. Mr. Masson. Mr. Facchini has about two and a half minutes. Thank you, Your Honors. Just a couple of quick points. Firstly, I'd just like to point out in the Court's prior decision, it stated that Hu itself teaches determining whether to power down in response to the L2 access leak ratio. It continued, the Board thus erred in determining that Hu does not use the L2 access leak ratio to determine whether to power down. And in its conclusion, it stated, we reversed the Board's determination that Hu does not teach the L2 access leak ratio to determine whether to power down a cash. So I submit that the Court did not extend its finding to the entire determining limitation, but limited its finding to the narrow issue of what the Board had done, which was find that L2 access leak was not used in connection with the determination of whether to power down. It said that it was, and we don't dispute that. I'd like to just respond to a couple of things that Mr. Masson said. He argued that this idea that the power saved by turning off is not the same as the power saved by resulting from powering down, that that's somehow our argument. That's not the case. I think, again, it's a little bit of a ham-fisted analogy, but the hamburger analogy is a good one. The idea is that an energy per access doesn't tell you how many accesses. It doesn't tell you how long you're going to shut it down for when you have an energy per cycle. Without that information, without estimates of that information, you just don't get there. You don't get revenue from price, you don't get cost from cost per hour, and you don't get energies from L2 access and leak. On the issue of reasonable expectation of success, Mr. Masson argued that both references teach deciding when to power down. I think we've shown the evidence is clear that Takahashi doesn't do that. It decides whether to power back up. So that's a different thing. How you would combine these two and whether you'd have success in doing that, that's not explained. There's no explanation. There's no factual foundation for that in the board's decision. He also argues that we made no differentiating arguments. Well, that's burden shifting, okay? This is Intel's burden initially and the board's burden. Was there a further modification of the combination in order to have the combination satisfy the elements of the dependent claims? I believe there would be, Your Honor, and this is spelled out in, for example, in the Teva Farms case where they said the reasonable expectation of success analysis must be tied to the scope of the claims. I don't know that you've answered my question. You mean? So my question was, for in the petition, after there was the original combination of the primary reference and view of the secondary reference, were there additional modifications that were proposed to be made, whether one of ordinary skill in the art would have thought that they were obvious or not, with respect to the dependent claims that you are arguing don't have a reasonable expectation for success? Well, I don't believe that Intel or the board argued for additional modifications of the references. I didn't think so. For the dependent claims. I would submit that they should have in order to reach. They argued that the modification, this Takahashi view of Hugh, taught the limitations in the dependent claims, right? Yes. And so why do they additionally have to show? After they have already shown that they're reasonable, there is a, let's assume for my purposes, that for the independent claim they've shown there's a reasonable expectation of success. Why would they have to show it yet again for the dependent claims if there isn't a further modification? Well, I guess what I would argue is that based on cases like Teva Pharmaceuticals, the reasonable expectation of success showing, which is an independent showing from the teachings of the references, that requires some tie to the scope of the claim. That's what the case said. In general. So it's your view that a party would have to show, for every single dependent claim, they have to show reasonable expectation of success different from what they showed with respect to the independent claim. Well, there either has to be an argument about why the same argument extends to the dependent claims or some recognition of the further scope that's in the dependent claims. There is a difference in scope. It must be recognized. All right. Thank you, counsel. We have both arguments. The case is submitted. Thank you very much.